## Illinois Steel Company v. Michael Jenco, Administrator.

### Gen. No. 4,835.

FELLOW-SERVANTS—*who within rule of.* Servants of the same master, to be co-employees so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, must be directly co-operating with each other in a particular business, that is, the same line of employment, or their usual duties should bring them into habitual association so that they may exercise a mutual influence upon each other promotive of proper caution.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1907. Affirmed. Opinion filed October 10, 1907.

**Statement by the Court.** Appellee, as administrator of the estate of Michael Jankovich, brought suit for the benefit of the widow and children as next of kin of the deceased, to recover damages for the death of Michael Jankovich, who was killed by a dust explosion in the works of appellant while in its employ.

The declaration contains six counts. The first count alleges that the defendant, on, etc., was engaged in the manufacture of iron and steel, etc., and used and operated certain

furnaces called "Furnaces Nos. 1 and 2"; that the deceased
was in the employ of defendant and was engaged in the line
of his duty under said employment in looking after certain in-
struments, which indicated the temperature in said furnaces
then and there operated by the defendant; that it was the
duty of the defendant to furnish said Jankovich a reasonably
safe place in which to perform his said services and not to
expose him to unnecessary danger; that there was located
near and connected with said furnaces a structure called a
"dust catcher"; that near said "dust catcher" the defendant
operated and maintained certain instruments for the purpose
of determining the temperature of said furnaces as afore-
said; that said defendant negligently permitted to be in said
dust catcher, upon the side on which said instruments were
located, a large opening without any guard to prevent the
dust from escaping from said dust catcher to the place where
said instruments were located and where the duties of said
Jankovich required him to be; that on, etc., while said Jan-
kovich was working for the defendant as aforesaid and while
in the exercise of ordinary care for his own safety and while
looking at said instruments to ascertain the temperature in
said furnaces, the defendant negligently permitted large
quantities of hot dust to escape from said dust catcher
through the opening aforesaid to where said Jankovich was
working, and he was thereby greatly burned and injured,
from the effects of which burns he thereafter died; that said
Jankovich left surviving him a widow and two children, his
next of kin; that by his death the next of kin have been de-
prived of their means of support, etc. The second count
avers that the defendant negligently permitted to be in said
dust catcher on the north side a large opening without any
doors to prevent hot flue dust from escaping from said dust
catcher, and that the defendant negligently placed said in-
strument which indicated the temperature in a shanty twenty
feet northerly from said opening. The third count contains
a further allegation that the defendant negligently caused
water to be thrown and poured upon a large quantity of hot
dust in said dust catcher, by means of which large quantities

of steam and gas were generated, which caused an explosion and caused large quantities of hot dust to escape from said opening to where said Jankovich was engaged, whereby he was burned, etc. The fourth count alleges that the defendant negligently operated said furnaces, and through such negligent operation, without notice to Jankovich, a large quantity of hot dust escaped, whereby he was greatly burned, etc. The fifth count alleges negligent construction of said dust catcher and the pipes and flues connected with furnace No. 1. The sixth count alleges that the defendant negligently permitted said dust catcher and the pipes and flues to become out of repair.

The defendant pleaded the general issue. Upon the trial the jury found the defendant guilty and assessed the plaintiff's damages at $4,000. A motion for a new trial was overruled and judgment entered on the verdict.

John H. Garnsey, for appellant; Knapp, Haynie & Campbell, of counsel.

J. J. Wellnitz and J. W. Downey, for appellee.

Mr. Justice· Thompson delivered the opinion of the court.

It is admitted in the record that about five o'clock on the morning of May 21, 1906, Michael Jankovich, an employee of appellant, was burned by an explosion of hot flue dust and injured so that he died on May 24th, leaving a widow and infant children. The evidence shows that in smelting iron ore in blast furnaces a large amount of dust is created and blown out by the blast; that much of this dust is unmelted ore and is saved and run through the furnace again; that appellant's furnaces Nos. 1 and 2 are fifty or sixty feet apart; that No. 1 is eighty-five feet high and twenty feet in diameter; that a dust catcher is connected with the top of the furnace to catch the dust out of the gas; that the blast is heated in what is termed the "stove," which is a structure fifteen feet in diameter and seventy-five feet high; that the

dust catcher connected with furnace No. 1 is located on the south side of the stove and is a circular structure of about the same height and diameter as the stove, and is constructed of brick; that there were three openings at the bottom of the dust catcher about three or four feet wide and seven feet high, or of sufficient size to permit a man to wheel a loaded wheelbarrow through them; that one of these openings was on the east, one on the southwest and one on the northwest; that in the interior of the dust catcher was a funnel-shaped receptacle called the "down comer" which received the dust as it fell from the flues; that at the bottom of the funnel was a "bell" valve worked by a lever, which when raised permitted the collected dust to run out; that the stockhouse wall is eight or ten feet west of the dust catcher and is twenty-five feet high; that north of the dust catcher was a wall connected with the stockhouse wall extending east and west and about one hundred feet high; that there were no doors or openings in either wall; that the dust catcher was located about twenty feet southeast of the angle formed by these two walls, and in this angle was a hot blast shanty about six by eight feet and seven feet high, in which was kept the pyrometer which was used to indicate the heat of the furnace; that the door to this shanty was on the south side of it, with a window on the east side; that the pyrometer for furnace No. 1 was inside this shanty, with its face towards and less than a foot from the window, lighted by an electric light so that it could be read from the outside; that up to about a year before this accident the red hot flue dust had been dumped on the floor of the dust catcher from the "down comer" and shoveled into wheelbarrows and removed in that way, but about a year before the accident a chute, seven or eight feet wide at the top but smaller at the bottom, was put in, leading from the bottom of the dust catcher down into the stockhouse which was located underneath the floor of the stove and dust catcher, with a slide in the bottom of the chute so that when dust was wanted the slide would be opened and the dust would run out into buggies below; that this chute dispensed with the use of the wheelbarrows and men for remov-

ing the dust through the opening, but they had not been closed in any way; that during the daytime a man was in charge of the dust catcher whose duty it was to empty the "down comer" through the bell valve into the chute at regular intervals; that during the night no person had this duty but it was done by whatever employee the foreman ordered to empty it; that Jankovich, the deceased, was the night man who had charge of the hot blast and he had a helper Bazik; that the pyrometers had to be read every fifteen minutes and a record kept of them in shanty No. 2, which was the one Jankovich had charge of, while Bazik looked after No. 1, and if either one did not have time to read his pyrometer the other read and recorded it; that the foreman under whom Jankovich and his helper worked was Andrew Benson; that the foreman of the stockhouse, which was on the lower floor, was McGoogin, who had nothing to do with Jankovich or his helper; that when Jankovich and his helper came to work the evening before the accident they took their dinner pails and coats into shanty No. 1, and there was a burst of dust at that time which frightened Jankovich, who had worked there several years; that at half-past eleven the night of the accident Jankovich, upon the order of Benson, had emptied the "down comer" into the chute, and the foreman from the stockhouse turned a hose on the dust, sticking it into the dust and leaving it there with the water running from the hose into the dust; that at the time of the explosion some of the men in the stockhouse below opened the slide in the chute to run the dust into a buggy, and this appears to have in some way, by mixing the water or saturated dust with the red hot dust, caused a very violent explosion, which threw the dust up the chute into the dust catcher and out through the northwest opening and into shanty No. 1, the door of which was in line with the northwest opening of the dust catcher, covering the floor of the shanty with red hot dust to a depth of two or three feet. Jankovich, who at the time the explosion occurred, was in this shanty for some reason which is not definitely shown by the proof, was so burned by the dust that he died. While it was the duty of Bazik to read the pyrom-

eter, yet the evidence tends to show that sometimes one did it for the other, and Bazik being a helper, Janovich was responsible for the performance of the duties of Bazik. Bazik testifies that it was necessary to go inside the shanty very often to wipe the dust off the window so that the pyrometer could be read. Bazik was at the time of this explosion on his way to the shanty to read the pyrometer, and Jankovich received his injuries while in the shanty, from an explosion caused by the acts of a foreman, who was in no way connected with him.

No question is raised or argued either as to the sufficiency of the declaration, the admission of evidence, or upon the giving, modifying or refusing instructions, except it is contended that the court erred in refusing to direct a verdict for the defendant at the close of appellee's evidence: "First, because Jankovich assumed the risk of explosions from hot dust around this dust catcher, they not being uncommon occurrences; second, because by his failure to turn on the water properly, and by going into the shanty without the exercise of ordinary care, he contributed to the injury; and third, because Jankovich was a fellow-servant of the man whose handling of the hose may have caused the injury."

The only question for us to pass upon is, can the judgment be sustained upon the evidence? The evidence of Benson, Jankovich's foreman, was that he never had known such an explosion to occur before the one that killed Jankovich. All that he had known was that Jankovich told him that evening, "they said something blowing there" and he thought the furnace had made a slip, and opened the bell and let down some dust. That was the only time he knew of it before this accident. It was not the duty of Jankovich to dump the "down comer," except as he was ordered to by his foreman. There was an employee charged with that duty in the daytime. It was seldom done at night, but when dust was required at night the foreman of the stockhouse would send word to Jankovich's foreman, and he would order the hot blast men to dump the "down comer." There was a water pipe around the bell valve that was turned on and sprinkled water while

the "down comer" was being dumped. The hose was turned on by McGoogin, the foreman of the lower floor on which was the stockhouse, and the evidence tends to show that that was the cause of the explosion. The question whether Mc-Googin and Jankovich were fellow-servants was a question of fact for the jury to determine from the evidence and under the instructions of the court. The jury were instructed upon the law as to who are fellow-servants, and the evidence showed that McGoogin and the deceased were in no way connected with each other in their duties. The rule regarding fellow-servants is "that the servants of the same master, to be co-employees so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, shall be directly co-operating with each other in a particular business, i. e., the same line of employment, or that their usual duties shall bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution. The idea is that the relations between the servants must be such that each as to the other, by the exercise of ordinary caution, can prevent or remedy the negligent act of the other or protect himself against its consequences; and of course, where there is no right or no opportunity of supervision, or where there is no independent will, and no right or opportunity to take measures to avoid the negligent acts of another without disobedience to the orders of his immediate superior, the doctrine can have no application." North Chicago Rolling Mill Co. v. Johnson, 114 Ill., 57; Illinois Steel Co. v. Ziemkowski, 220 Ill., 324. It appears from the evidence that Jankovich had no right and no opportunity of supervision over McGoogin, and that Jankovich had no right or opportunity to take measures to avoid the negligent acts of Mc-Googin, without disobedience to the orders of Benson, his immediate superior. It is only when the evidence shows beyond question that the relation of fellow-servants exists that a motion to take the case from the jury becomes one of law. The jury were justified in finding they were not fellow-servants.

36

Upon appellant's second proposition, the water was turned on while the down comer was being dumped through the pipe around the bell valve, and afterwards the hose was by McGoogin turned on and left running into the chute. The evidence shows that the hose being left running in the hot dust, and the opening of the slide by men on the lower floor with which Jankovich had no connection, caused the explosion. The duty to read the pyrometer required some one to go into the shanty to read it or to clean the dust off the window so that it could be read from the outside. There was no failure to exercise ordinary care in going into the shanty when the performance of his duty required his presence there.

Upon appellant's first proposition, it was the duty of appellant to furnish the deceased with a reasonably safe place to work. Jankovich assumed the risk of the usual and ordinary dangers incident to his employment, and the risk of all those dangers which he knew or in the exercise of ordinary care he ought to have known. The assumption of dangers incident to his employment does not include those caused by the negligence of the master, either directly, or by the acts of employees of the master who are not co-employees of the deceased which create a new and unknown danger. The act of the deceased in entering the shanty in no way contributed to causing the explosion. The proximate cause of his death was the explosion caused by pouring water through a hose into the red hot dust and the movement of the dust in the chute when the slide at the bottom was opened. The fact that there were unnecessary openings or openings without doors in the dust catcher was not the proximate cause of the injuries.

There was no such imminent danger in the location of the hot blast shanty, and the openings in the dust catcher, as required the deceased to give up his employment or be barred from a recovery for injuries received in such service, unless it can be said that they were the proximate cause of the injury. To go into the shanty was such an act as might have been done by a reasonably prudent person acting with ref-

erence to his own personal safety.    There is evidence upon which the verdict can be sustained, and the Circuit Court properly refused to direct a verdict for the defendants.    The judgment is affirmed.

*Affirmed.*

MR. JUSTICE DIBELL, having presided at the trial of this case in the lower court, took no part in its decision here.